LANDMARK BANK, N.A.,

      Plaintiff,

v.

COMMUNITY CHOICE FINANCIAL, INC.
and **BUCKEYE CHECK CASHING OF
FLORIDA, INC.**,

      Defendants.

_____/

# ORDER

**THIS CAUSE** comes before the Court on Defendants, Community Choice Financial, Inc. ("CCFI") and Buckeye Check Cashing of Florida, Inc.'s ("Buckeye's") Motion to Dismiss Amended Complaint [ECF No. 43], filed on July 26, 2017. Defendants seek dismissal of Plaintiff, Landmark Bank, N.A.'s seven-count Amended Complaint [ECF No. 40] on the grounds it fails to state a claim upon which relief may be granted, and the Court lacks jurisdiction over Defendant CCFI. Plaintiff filed a Memorandum of Law in Opposition ("Response") [ECF No. 45], to which Defendants filed a Reply [ECF No. 51].

Also before the Court is Plaintiff's Request for Judicial Notice [ECF No. 52]. Defendants oppose Plaintiff's Request (*see* Opposition to Request [ECF No. 53]) on the basis the documents attached to Plaintiff's Request are irrelevant and the Request itself is untimely. (*See id.* 4). Plaintiff filed its Reply [ECF No. 54] on September 12, 2017. Defendants' argument "[i]f Centennial believed there was an inconsistency . . . the time to raise this would have been in connection with its opposition, not after briefing was completed on the Motion to Dismiss" (Opp'n 4 (alterations added)), is well-taken.

Although "[c]ourt documents from a prior proceeding are matters of public record and 'capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned," *Weaver v. Mateer & Harbert, P.A.*, No. 5:09-cv-514-Oc-34TBS, 2012 WL 3065362, at *3 n.7 (M.D. Fla. July 27, 2012) (alteration added; internal quotation marks omitted) (quoting *Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010)), the Request is untimely. Local Rule 7.1 provides: "[a]ll material in support of any motion, response, or reply . . . shall be served with the filing." S.D. FLA. L.R. 7.1(c) (alterations added). The documents attached to the Request are copies of documents filed in the state court proceedings, in existence prior to Plaintiff's filing of its Response to the Motion, and Plaintiff has not shown good cause to depart from the requirements of the Local Rules. Therefore, the Court declines to take judicial notice of the documents attached to the Request in connection with Plaintiff's Response.

The Court has carefully considered the parties' written submissions, the record,[1] and applicable law. For the reasons explained below, the Motion to Dismiss is granted in part and denied in part.

## I. BACKGROUND

This case arises out of a series of complex financial transactions involving Plaintiff, Defendants, certain of Defendants' subsidiaries, and a number of third parties not named in this action. The Amended Complaint seeks money damages in connection with Defendants' alleged conspiracy to defraud Plaintiff by coordinating with certain non-parties to execute numerous fraudulent conveyances designed to destroy Plaintiff's security interests, and to tortiously interfere with Plaintiff's business and contractual relationships. (*See generally* Am. Compl.).

---

[1] In addition to the parties' written submissions, the Amended Complaint, and the exhibits to the Amended Complaint (*see* [ECF Nos. 40-1 through 40-26]), the Court also considers the exhibits attached to Defendants' Request for Judicial Notice [ECF Nos. 44-1 through 44-5] (*see* Order [ECF No. 48]), and the SEC filings attached to Plaintiff's Request for Judicial Notice [ECF Nos. 49-1 through 49-3] (*see* Order [ECF No. 50]).

**A. Parties and Relevant Entities**

Plaintiff is a national banking association authorized to transact business in Florida. (*See id.* ¶ 3). It is the successor-in-interest, through the Federal Deposit Insurance Corporation, to now-defunct Valley Bank. (*See id.* ¶¶ 3, 51).

Defendant, CCFI, is an Ohio corporation conducting business in Florida, either directly or indirectly through its agent-subsidiaries. CCFI is "the corporate hub of a multi-state network of agent-subsidiaries through which CCFI operates as a provider of alternative financial services." (*Id.* ¶ 7). Those alternative financial services include prepaid debit card services, check cashing, credit servicing, and short- and medium-term consumer loans. (*See id.* ¶¶ 6–7, 11). CCFI is licensed to do business in Florida. (*See id.* ¶ 8).

"[CCFI's] agent-subsidiaries conduct business solely for CCFI, . . . act as the exclusive agents for . . . CCFI in the jurisdictions in which they are licensed[,]" and "exist and function solely to achieve CCFI's business purposes." (*Id.* ¶¶ 12–13 (alterations added)). "CCFI exerts significant operational control over its agent-subsidiaries." (*Id.* ¶ 14). For example, CCFI controls the location of retail stores and signage and store design for all locations. (*See id.* ¶ 21).

CCFI utilizes a national training coordinator, and employs district managers and internal staff to review each retail store nationwide. (*See id.* ¶¶ 15–16). CCFI has a centralized information management system for all retail stores "to support customer service . . . , and to manage the transaction risk, collections, record-keeping, compliance, and daily reporting of [all] its retail stores." (*Id.* ¶ 17 (alterations added)). "CCFI maintains primary processing systems for its internet lending operations in a single facility, which . . . serves all of CCFI's agent-subsidiaries offering financial services over the internet." (*Id.* ¶ 18 (alteration added)). CCFI has a centralized collections division and, as receivables age, "collection responsibility shifts solely

to CCFI's internal collection division." (*Id.* ¶ 19). CCFI's collection activities are centralized at call centers in Ohio and Arizona. (*See id.*). CCFI also maintains a centralized legal and compliance department responsible for company-wide policies. (*See id.* ¶ 20).

In its Securities and Exchange Commission filings, CCFI defines the term "company" to include CCFI and its agent-subsidiaries. (*See id.* ¶ 23). CCFI is the 100 percent stockholder and indirect parent company of Defendant, Buckeye. (*See id.* ¶ 6). Buckeye is also an Ohio corporation authorized to conduct business in Florida. (*See id.* ¶ 24). According to the Amended Complaint, Buckeye is one of CCFI's agent-subsidiaries and exists only to achieve CCFI's business purposes. (*See id.* ¶¶ 24–26).

Non-party Buckeye Check Cashing of Florida II, LLC ("Buckeye II") is a Florida limited liability company, first formed in 2012 to serve as Buckeye and CCFI's agent-subsidiary in southeast Florida. (*See id.* ¶ 29). Until January 2016, Buckeye was the sole member of Buckeye II. (*See id.* ¶ 28).

The Osman Family Network is a collection of businesses owned, managed, and controlled by members of the Osman family, among them Osman Family Holdings, LLC ("OFH"). (*See id.* ¶¶ 36, 51). Also among those businesses are certain entities engaged in check cashing and payday lending in Southeast Florida. (*See id.* ¶ 37). Those entities are: Foremost Inc. ("Foremost"), Check Cashing U.S.A., Inc. — now known as The Osmans, Inc. — ("CCUSA"), and Armando's, Inc. ("Armando's" together with Foremost and CCUSA, "Pledgors"). (*See id.*). The Osman Family Network also owns and operates plant nursery businesses, Medallion Container Nurseries, LLC ("MCN") and MGNF, LLC. (*See id.* ¶ 64). Valley Bank had an active lending relationship with at least some of the Osman Family Network

entities until those businesses defaulted on various loan obligations to Valley Bank between October and December 2013. (*See id.* ¶¶ 36, 64).

### B. The Buckeye Transactions

In April 2012, The Osman Family Network sold its check cashing business and assets to Buckeye for $42,000,000. (*See id.* ¶ 40; *see also id.*, Ex. A, Asset Purchase Agreement [ECF No. 40-1]). In connection with this transaction, CCFI caused Buckeye II to be formed as a Delaware limited liability company in June 2012. (*See* Am. Compl. ¶ 42). The transaction was structured so Buckeye would hold the Pledgors' membership interests in the check cashing and payday lending business entities, and Buckeye II would become the owner of the entities' assets. (*See id.* ¶ 43).

In exchange, Buckeye II executed and delivered a secured term note dated August 1, 2012 for eight million dollars in favor of the Pledgors ("Buckeye II Note"). (*See id.* ¶ 45; *see also id.* Ex. B, Buckeye II Note [ECF No. 40-2]). CCFI also conveyed to Pledgors ten million dollars' worth of CCFI common stock. (*See* Am. Compl. ¶ 46; *see also id.*, Ex. C, Stock Certificate [ECF No. 40-3]). As a result, Pledgors became shareholders of CCFI, subject to the restrictions of a Shareholders Agreement dated April 29, 2011, which prohibited Pledgors from transferring, assigning, pledging, or otherwise encumbering the stock until certain conditions precedent had been satisfied. (*See id.* ¶¶ 49–50).

An amendment to the Asset Purchase Agreement also granted Pledgors a "put option" giving them the right to require Buckeye II to purchase all, but not less than all, of the CCFI Stock at a purchase price of $12.76 a share. (*See* Am. Compl. ¶ 47; *see also id.*, Ex. D, First Amendment to Asset Purchase Agreement [ECF No. 40-4] ¶ 8). The "Put Option" was set to ripen in July 2017. (*See* Am. Compl. ¶ 48).

### C. The Osman Family Network Loans

#### 1. The OFH Loan

During 2012 and 2013, OFH executed and delivered a series of promissory notes in favor of Valley Bank, which resulted in a Consolidated, Amended and Restated Promissory Note dated February 13, 2013 in the amount of $5,500,000 ("OFH Loan"). (*See id.* ¶ 52; *see also id.*, Ex. E, OFH Loan [ECF No. 40-5]). Pledgors executed a Security Agreement dated November 30, 2012, granting Valley Bank a security interest in the Buckeye II Note and certain related agreements. (*See* Am. Compl. ¶ 53; *see also id.*, Ex. F, Security Agreement [ECF No. 40-6]). Pledgors also collaterally assigned the Buckeye II Note to Valley Bank through a Collateral Assignment of Note and Collateral Documents (the "Collateral Assignment"), which conditionally assigned Valley Bank a first position security interest in all assets of Buckeye II (the "Buckeye II Collateral"). (*See* Am. Compl. ¶ 54; *see also id.*, Ex. G, Collateral Assignment [ECF No. 40-7]).

#### 2. The MCN and MGNF Loans

MGNF executed two promissory notes in favor of Valley Bank in 2011 and 2013, totaling $5,078,131. (*See* Am. Compl. ¶ 65). The MGNF Loans were secured by personal property and guaranties, among other things. (*See id.* ¶ 66). MCN executed two promissory notes in December 2012, also in favor of Valley Bank, totaling $7,000,000. (*See id.* ¶ 67). The MCN Loans were secured by a first-position lien on one-half of all proceeds from the sale of the CCFI Stock and a contingent and conditional interest in 500,000 shares of the CCFI Stock. (*See id.* ¶ 68).

### 3. The Forbearance Agreements

In October 2013, both MCN and MGNF defaulted on their loan obligations. (*See id.* ¶ 69). Later that year, in November, OFH defaulted on its loan obligations under the OFH Loan. (*See id.* ¶ 55). Valley Bank subsequently failed, largely due to the Osman Family Network defaults. (*See id.*).

In June 2014, the FDIC, as receiver for Valley Bank, assigned the OFH Loan, the MCN Loans, and the MGNF Loans to Valley Bank through an Allonge dated June 20, 2014, and an Assignment of Note, Mortgage, and Loan Documents. (*See id.* ¶ 56; *see also id.*, Ex. H, FDIC Allonge and Assignment [ECF No. 40-8]). Shortly thereafter, Landmark notified Buckeye II of the OFH Loan default and directed Buckeye II to deliver all payments made under the Buckeye II Note directly to Landmark. (*See* Am. Compl. ¶ 119; *see also id.*, Ex. R, July 30, 2014 Letter [ECF No. 40-18]). Buckeye II acknowledged receipt of the July 30 Letter and explained it would make payments to an escrow or trust account, so as to avoid "having to determine the rights of the Lender versus those of Landmark Bank, N.A." (Am. Compl., Ex. T, August 28, 2014 Telefax [ECF No. 40-20]).

Landmark then entered into a number of forbearance agreements with the Osman Family Network. The OFH Forbearance Agreement entered into with OFH, Daniel Osman, and Pledgors was executed December 24, 2014 ("OFH Forbearance Agreement"). (*See id.* ¶ 58; *see also id.*, Ex. V, OFH Forbearance Agreement [ECF No. 40-22]). The OFH Forbearance Agreement confirmed the above-described arrangement whereby Buckeye II would make payments directly to Landmark. (*See* Am. Compl. ¶ 122; *see also* OFH Forbearance Agreement § 5(c)). Beginning in August 2014, Landmark received 22 monthly payments of $66,666.67 on the Buckeye II Note from CCFI or Buckeye at CCFI's direction. (*See* Am. Compl. ¶ 123). In

February 2015, CCFI's CFO sent a letter to counsel for Landmark requesting confirmation of the amount due on the Buckeye II Note. (*See id.* ¶ 124; *see also id.*, Ex. W, February 27, 2015 Letter [ECF No. 40-23]).

OFH, however, defaulted on its loan obligations under the OFH Forbearance Agreement in July 2015. (*See* Am. Compl. ¶ 61). Landmark was immediately entitled to payment under the Buckeye II Note and to foreclose on the Buckeye II Collateral. (*See id.* ¶ 62).

Additionally, Landmark, MGNF, and Ellen Osman entered into a forbearance agreement dated December 24, 2014 ("First MGNF Forbearance Agreement"); Landmark, MGNF, Ellen Osman, and Martin Osman entered into a forbearance agreement also dated December 24, 2014 ("Second MGNF Forbearance Agreement"); and Landmark, MCN, Martin Osman, and CCUSA entered into what is known as the "MCN Forbearance Agreement." (*See id.* ¶ 73). In consideration for the MGNF Forbearance Agreements, the Osman Family Network granted Landmark additional interests in the CCFI Stock and CCFI Stock Proceeds. (*See id.* ¶ 74).

In August 2015, after various events of default under both MGNF Forbearance Agreements and the MCN Forbearance Agreement, Landmark initiated foreclosure proceedings against MGNF and MCN. (*See id.* ¶ 77). At the time, MGNF and MCN owed Landmark more than $13,000,000. (*See id.*). In September 2015, the receiver appointed in the foreclosure proceedings determined a complete liquidation of MGNF and MCN was necessary. (*See id.* ¶ 78).

### D. The Conspiracy to Defraud Landmark

Plaintiff alleges it was around this time, in late 2015, that Defendants and the Osman Family Network devised their scheme to defraud Landmark. According to the Amended Complaint, CCFI decided to dispose of a large portion of its check cashing and payday lending

retail locations in southeast Florida, in anticipation of certain federal regulations that would make those businesses less profitable. (*See id.* ¶ 81). In addition, CCFI decided to claw back its stock and the cash invested in Buckeye and Buckeye II. (*See id.* ¶¶ 83–84). Plaintiff alleges these motivations are clearly evidenced by certain filings CCFI submitted to the Securities and Exchange Commission. (*See id.* ¶ 83). Simultaneously, principals of the Osman Family Network determined they should re-enter the check cashing and payday lending businesses to maintain the Network's financial viability. (*See id.* ¶ 86).

According to the Amended Complaint, Landmark's first-position lien on Defendants' southeast Florida check cashing and payday lending business assets, and its rights to the CCFI Stock and CCFI Stock Proceeds were "a major collective obstacle to Defendants' sale of their southeast Florida check cashing business and payday lending assets to the Osman Family Network." (*Id.* ¶ 87). "CCFI could not legally sell off Buckeye II and claw back the cash and stock it had invested . . . without satisfying Landmark's security interests in the Buckeye II Note and the Buckeye II Collateral" (*id.* ¶ 88 (alteration added)); nor could the Osman Family Network repurchase its check cashing and payday lending businesses without resolving Landmark's interests in the Buckeye II Note, the Buckeye II Collateral, the CCFI Stock, and the CCFI Stock Proceeds (*see id.* ¶ 89). Plaintiff alleges Defendants threatened to allow Buckeye II's branches to close to force the Osman Family Network principals to join in their scheme to defraud Landmark. (*See id.* ¶ 91).

In December 2015, the Osman Family Network formed Buckeye Check Cashing of Florida III, LLC ("Buckeye III") as a Florida limited liability company. (*See id.* ¶ 97). In January 2016, Buckeye – as the sole member of Buckeye II, Buckeye III, CCUSA Holdings, and Pledgors entered into a Membership Interest Purchase Agreement (*see id.*, Ex. K, [ECF No. 40-

11]).  Under the MIPA, Buckeye III purchased 100 percent of Buckeye's membership interests in Buckeye II ("Buckeye II Sale").  (*See* Am. Compl. ¶ 99).  As consideration for the sale, the one million shares of CCFI Common Stock previously conveyed to Pledgors were returned to CCFI, the Put Option was canceled, and CCFI was released from liability under the Buckeye II Note and a second promissory note related to CCFI's acquisition of the Osman Family Network check-cashing businesses.  (*See id.* ¶ 100).

Shortly after the sale was completed, on January 24, 2016, Buckeye, Buckeye II, and Pledgors entered into an Intercreditor Agreement in connection with the Buckeye II Sale and Assignment.  (*See id.* ¶ 106).  In the Intercreditor Agreement, Pledgors agreed to grant Buckeye a first-position lien on the Buckeye II Collateral and subordinate their security interests in the Buckeye II Note and Collateral to Buckeye.  (*See id.*).

On January 31, 2016, Buckeye III caused Buckeye II to assign 100 percent of Buckeye II's assets to Taso Group, LLC ("Buckeye II Assignment").  (*See id.* ¶ 104).  Taso is a limited liability company operated by two longtime associates of the Osman Family Network, Brian Socolow and Merrill Jay Taub.  (*See id.* ¶ 104; *see also id.*, Ex. M, Buckeye II Assignment and Assumption Agreement [ECF No. 40-13]).

Additionally, in connection with the Buckeye II Sale and Assignment, Buckeye, Buckeye II, Buckeye III, Taso, and Pledgors entered into a Secured Revolving Note.  (*See id.* ¶ 107).  Under the Buckeye III Note, Buckeye agreed to make loans to Buckeye II and Taso up to $6,000,000.  (*See id.* ¶ 108).  The terms of the Buckeye III Note state immediately upon Taso's execution of the Buckeye III Note, Buckeye II would cease to be a borrower under the Buckeye III Note and the only remaining borrower would be Taso.  (*See id.*).

The Buckeye III Note is secured by a Security and Pledge Agreement entered into by Buckeye and Taso ("Taso Security Agreement"), whereby Taso granted Buckeye a security interest in the Buckeye II Collateral. (*See id.* ¶ 109; *see also id.*, Ex. P, Taso Security Agreement [ECF No. 40-16]). Buckeye II, at CCFI's direction, drew $2,632,000 on the Buckeye III Note. (*See id.* ¶ 110). Upon receipt of the funds, Buckeye II paid 100 percent of the funds to CCFI. (*See id.*). CCFI, through Buckeye, continues to receive payments under the Buckeye III Note. (*See id.* ¶ 111).

As a result of the draw-down on the Buckeye III Note, Buckeye II was both stripped of 2,632,000 dollars' worth of assets and saddled with an equal amount of debt, and could therefore no longer satisfy its obligations under the Buckeye II Note. (*See id.* ¶ 112). By May 2016, CCFI had directed Buckeye III to cause Buckeye II to draw down substantially all of the credit extended in the Buckeye III Note. (*See id.* ¶ 113). Buckeye then reacquired five of the most profitable South Florida check cashing retail locations from Buckeye III. (*See id.*).

### E. Damages

Plaintiff alleges Defendants' fraudulent scheme resulted in Plaintiff being forced to settle with the Osman Family Network for less than 60 percent of the value of the OFN's obligations to avoid incurring further losses. (*See id.* ¶ 130; *see also id.*, Ex. Z, Settlement Agreement [ECF No. 40-26]). According to Plaintiff, it was "obliged to settle . . . because to fully enforce its rights and remedies under the OFH Loan and OFH Forbearance Agreement, Landmark would have been required to file and prosecute multiple lawsuits to unwind the various complex[,] fraudulent transactions[,]" and risk Defendants and the Osman Family Network further impairing its security interests. (Am. Compl. ¶ 131 (alterations added)).

As part of the Settlement Agreement, Landmark released the Osman Family Network from any and all claims arising from the aforementioned transactions (*see id.* ¶ 132), but retained the right to sue Defendants in connection with the same transactions (*see id.* ¶ 133; *see also* Settlement Agreement ¶ 2(k)). Plaintiff also alleges the Defendants' and Osman Family Network's actions ensured Plaintiff could never exercise its rights in the CCFI Stock and CCFI Stock Proceeds — resulting in apparently $6,000,000 in losses to Plaintiff. (*See* Am. Compl. ¶ 136). In August 2016, Plaintiff assigned its interest in the Buckeye II Note and Buckeye II Collateral to Prestige Worldwide I, LLC for $3,000,000. (*See* Request for Judicial Notice, Ex. B, Corrective Assignment of Note and Collateral Documents ("Prestige Assignment") [ECF No. 44-2]).

### F. Additional Jurisdictional Facts

Plaintiff took limited jurisdictional discovery and, in its Response, adduces facts the Court may consider in determining whether CCFI is subject to jurisdiction in the Southern District of Florida. (*See generally* Resp., Ex. 1, Declaration of Ellsworth Summers and Exhibits [ECF No. 45-1]; *see also id.*, Ex. 2, Affidavit of Brian Socolow and Exhibits [ECF No. 45-2]; *id.*, Ex. 3, Declaration of Declaration of Kevin Mercer and Attachments [ECF No. 45-3]).

All employees of CCFI and its agent-subsidiaries are employees of CCFI's wholly-owned subsidiary, CheckSmart. (*See* Resp. 17 n.18). CCFI and Buckeye have complete identity of directors and officers. (*See id.* 18). CCFI and Buckeye share corporate headquarters. (*See id.*). CCFI files consolidated reports on behalf of CCFI and its agent-subsidiaries with the Securities and Exchange Commission. (*See id.*).

CCFI directly contracts on behalf of its agent-subsidiaries and controls their relationships with vendors. (*See id.*). CCFI prepays liabilities incurred in connection with those relationships.

(*See id.*).  Deputy General Counsel for CheckSmart, Sean O'Brien, commented on a draft of the MIPA explaining, "[m]y understanding is that the business practice is that certain liabilities (Western Union, Moneygram, etc.) are run through CCFI, resulting in the intercompany indebtedness." (Mercer Decl. 68 (alteration added)).  In another comment, counsel stated, "[m]y understanding is that the business practice is that the liabilities run through CCFI and are essentially prepaid as a result." (*Id.* 131 (alteration added)).

CCFI is the borrower on a $47,000,000 revolving line of credit, guaranteed by 98 of its subsidiaries, including Buckeye.  (*See* Resp. 18 (citing Summers Decl., Ex. C, Third Amendment to Revolving Credit Agreement [ECF No. 45-1] 155)).

CCFI officers travel regularly to Florida, including one visit in September 2015 to meet with Landmark's Chief Credit Officer to discuss Landmark's security interests.  (*See id.* 19 (citing Affidavit of Robert Santom [ECF No. 47] ¶¶ 2–4)).  CCFI routinely corresponded with subsidiaries' landlords on CCFI letterhead, including informing them of the change in ownership from Buckeye II to Buckeye III.  (*See id.*).  Lance Solomon, SVP for CCFI, helped manage "several key vendor relationships" during the transition, explaining he was assisting "largely [as] a result of the fact that 'loss' of this business by CCFI could potentially result in clawbacks or penalties." (Socolow Aff., Ex. A, Email from Lance Solomon to Brian Socolow 421 (alteration added)).  Through early 2016, CCFI used its corporate accounts with several vendors to Taso's benefit, and several South Florida vendors billed CCFI directly for services rendered on behalf of Buckeye III-purchased locations.  (*See* Resp. 20).

CCFI negotiated the MIPA and Buckeye III Note between November 2015 and January 2016, sending various emails to Pledgors and CCUSA, and also participated in the post-sale transition.  (*See id.* 19).  At least 30 employees, using email signatures with a CCFI suffix, sent

emails to Florida during the same period. (*See id.*). CCFI owns the Right of First Refusal pursuant to the MIPA. (*See id.* (citing Socolow Aff., Ex. A)).

CCFI has seven listed telephone numbers and office locations in Florida, and three of those are listed on CCFI's store finder on its website. (*See id.* 20 (citing Summers Decl. ¶ 10 & Ex. H)). CCFI also appears to have instructed Taso to wire funds from Florida to CCFI to pay off Buckeye III's six million dollar line of credit owed to Buckeye. (*See id.* (citing Socolow Aff., Ex. A)). Taso has, in the past, overnighted a check for one million dollars to Community Choice Financial. (*See id.* 19 n.23 (citing Socolow Aff., Ex. A 392)).

CCFI "holds itself out to consumers as doing business in Florida," and Buckeye uses the registered fictitious name "Community Choice Financial" in Florida. (*Id.* 19). CCFI's website promotes the name "Community Choice Financial" as its trade name, and the website includes a store map locator to promote CCFI's nationwide network of over 500 stores — including stores in South Florida. (*See id.* 20–21). CCFI uses "Community Choice Financial" in its press releases, rarely mentioning its subsidiaries. (*See id.* 21). CCFI uses "Community Choice Financial" as a "d/b/a" in 23 of the 30 states in which it operates. (*See id.*).

Checklists used to collect information on customers and applications for check cashing are printed on CCFI-Florida letterhead, as are a number of other documents employees must use to process a customer. (*See id.* (citing Socolow Aff., Ex. A 336–370)).

**G. Claims**

Plaintiff states seven claims for relief in its Amended Complaint. Count I is a claim of actual fraud under the Florida Uniform Fraudulent Transfer Act ("FUFTA"), in violation of Section 726.105(1)(a), Florida Statutes (*see* Am. Compl. ¶¶ 139–57); Count II is a claim of constructive fraud under the FUFTA, in violation of Section 726.105(1)(b) (*see id.* ¶¶ 158–64);

Count III is a claim of fraud involving a security interest, in violation of Section 817.562(1), Florida Statutes (*see id.* ¶¶ 165–79); Count IV is a claim of conspiracy to commit fraudulent transfer (*see id.* ¶¶ 180–91); Count V is a claim of tortious interference with a contractual relationship (*see id.* ¶¶ 192–207); Count VI is for conspiracy to interfere with a contractual relationship (*see id.* ¶¶ 208–17); Count VII is for tortious interference with a business relationship (*see id.* ¶¶ 218–33); and Count VIII is for conspiracy to interfere with a business relationship (*see id.* ¶¶ 234–44). The underlying factual allegations pertaining to each count are discussed in greater detail below.

## II.    LEGAL STANDARDS

### A.    Federal Rule of Civil Procedure 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiff need not plead "detailed factual allegations," but the complaint must offer "more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Id.* (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555). "[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (second alteration in original; internal quotation marks omitted) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

To meet the *Iqbal/Twombly* plausibility standard, a complaint must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556 (alteration

added)). A claim will not survive "if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks and alteration omitted) (quoting *Twombly*, 550 U.S. at 557).

On a motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and accepts its factual allegations as true. *See Brooks v. Blue Cross Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)). Unsupported allegations and conclusions of law, however, will not benefit from this favorable reading. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."); *see also Sinaltrainal v. Coca-Cola*, 578 F.3d 1252, 1261 (11th Cir. 2009) ("[U]nwarranted deductions of fact in a complaint are not admitted as true for the purpose of testing the sufficiency of [a] plaintiff's allegations." (alterations added; internal quotation marks omitted) (quoting *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005))).

While a court is generally limited to the allegations of the Complaint in evaluating a Rule 12(b)(6) motion to dismiss, "where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the [c]ourt may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal." *Brooks*, 116 F.3d at 1369 (alteration added; citation omitted). Where those "exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009) (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007)). The Court may also consider documents whose "authenticity and veracity are . . . unchallenged." *Long v. Slaton*, 508 F.3d 576, 578 n.3 (11th Cir. 2007) (alterations added) (considering investigative report plaintiffs submitted in opposing motion to dismiss).

### B. Rule 12(b)(2)

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss a claim against it by asserting the defense of lack of personal jurisdiction. In the case of a non-resident defendant, a federal court may properly exercise personal jurisdiction only if the requirements of (1) the relevant state long-arm statute; and (2) the Due Process Clause of the Fourteenth Amendment to the United States Constitution are both satisfied. *See Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1214 (11th Cir. 1999) (citing *Sculptchair, Inc. v. Century Arts Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996)).

"A plaintiff seeking to establish personal jurisdiction over a nonresident defendant 'bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction.'" *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009)). "The district court must accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits." *Peruyero v. Airbus S.A.S.*, 83 F. Supp. 3d 1283, 1286 (S.D. Fla. 2014) (citing *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000)). If a plaintiff pleads sufficient facts to support the exercise of personal jurisdiction, the burden shifts to the defendant to make a prima facie showing of the inapplicability of the state's long-arm statute. *See Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000) (per curiam) (citation omitted).

If the defendant satisfies its burden, the burden then shifts back to the plaintiff to "substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint." *Id.* (citation omitted). "The district court must construe all reasonable inferences in the light most favorable to the

plaintiff when dealing with conflicting evidence." *Peruyero*, 83 F. Supp. 3d at 1287 (citing *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 810 (11th Cir. 2010)) (other citation omitted).

## III.    DISCUSSION

In their Motion, Defendants assert Plaintiff lacks standing to bring certain claims, the Court lacks personal jurisdiction over CCFI, and, in any event, the Complaint fails to state a claim upon which relief can be granted.  (*See generally* Mot.).  The Court addresses each argument in turn.

### A.  Standing

As noted, on August 4, 2016, Plaintiff executed the Prestige Assignment with Prestige Worldwide I, LLC and Taso.  The Prestige Assignment reads as follows:

> Upon payment to Assignor of $3,000,000.00, Assignor does hereby grant, bargain, assign, transfer[,] and set over unto Assignee, all of Assignor's right, title, interest, claim[,] and demand in and to the OFH Note and the Collateral Documents, and all rights, remedies and incidents thereunto belonging. Concurrently herewith, Assignor has endorsed to Assignee, without recourse, the OFH Note, pursuant to a certain Allonge to Note . . . .  This Assignment is made by Assignor without recourse, representation or warranty, of any kind, whether express or implied, except as follows:
> . . .
> (c) Assignor has not executed any release or subordination relating to any lien, assignment[,] or security interest securing the OFH Note, including, but not limited to, those created under the Collateral Documents, other than as provided in that certain Settlement Agreement of even date herewith and the Releases attached thereto as Composite Exhibit "A."

(Prestige Assignment ¶ 2 (alterations added)).

Defendants argue Plaintiff cannot assert any claims based on the Buckeye II Note or Collateral, given Plaintiff unqualifiedly assigned those security interests to Prestige.  (*See* Mot.

10).   Because all of Plaintiff's claims rely, in whole or in part, on the Buckeye II Note and Collateral security interests, Defendant argues all of Plaintiff's claims should be dismissed.  (*See id.* 12).   Alternatively, Defendants ask that all allegations related to the Buckeye II Note and Collateral be stricken from the Amended Complaint.  (*See id.*).

According to Plaintiff, clause 2(c) of the Prestige Assignment acts as a limitation on the assignment, and "specifically retains Plaintiff's rights to bring the claims alleged" in the Amended Complaint against Buckeye and CCFI.  (Resp. 3).  Plaintiff also contends the scope of the assignment is limited to claims sounding in contract, and because Plaintiff's claims all sound in tort or fraud they were "therefore not assigned."  (*Id.* 2 (citations omitted)).  This argument fails to persuade.

Under Florida law, it is "well established that an unqualified assignment transfers to the assignee all the interests and rights of the assignor in and to the thing assigned.  The assignee steps into the shoes of the assignor[.]"  *State v. Family Bank of Hallandale*, 667 So. 2d 257, 259 (Fla. 1st DCA 1995) (alteration added) (citing *Dependable Ins. Co. v. Landers*, 421 So. 2d 175, 179 (Fla. 5th DCA 1982)).   "[O]nce transferred, the assignor no longer has a right to enforce the interest because the assignee has obtained all rights to the thing assigned."  *Cont'l Cas. Co. v. Ryan Inc. E.*, 974 So. 2d 368, 376 (Fla. 2008) (alteration added; internal quotation marks and citation omitted).

The language of the Prestige Assignment is very broad, encompassing "all of Assignor's right, title, interest, claim and demand in and to the OFH Note and the Collateral Documents, and all rights, remedies[,] and incidents thereunto belonging."  (Prestige Assignment ¶ 2 (alteration added)).  Even though the claims in the Amended Complaint are all either tort-based or statutory causes of action, they are part of the "rights, remedies[,] and incidents" belonging to Plaintiff

under the OFH Note and Collateral Documents to the extent they contemplate some remedy for the transfer of the Buckeye II Note and Buckeye II Collateral. *See, e.g.*, *Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1227 (S.D. Fla. 2009) ("Following an assignment, the assignee stands in the shoes of the assignor and the assignor retains no rights to enforce the contract at all. . . . As such, [the assignee] . . . may sue for breach of those contracts and for any cause of action in tort arising from those contracts." (alterations added; internal quotation marks and citations omitted)); *see also W.S. Badcock Corp. v. Webb*, 699 So. 2d 859, 861 (Fla. 5th DCA 1997) ("Contract rights that can be assigned include choses in action arising out of the parties' contract. . . . In fact, assignability of a cause of action is the rule rather than the exception." (alteration added; internal citations omitted))

Plaintiff's claims are, in part, derived from the very instruments assigned to Prestige. Setting aside the obvious example of Plaintiff's claim for tortious interference with a contractual relationship, which Plaintiff directly ties to the OFH Loan and Forbearance Agreement (*see* Am. Compl. ¶ 194), Plaintiff's fraudulent conveyance claims are premised on the alleged rights and duties arising out of the OFH Loan and Forbearance Agreement (*see, e.g.*, *id.* ¶¶ 141, 162).

Plaintiff cites authority from outside this jurisdiction in support of its argument tort and fraud claims are not included in the Prestige Assignment. (*See* Resp. 2 (citations omitted)). Those cases do not support Plaintiff's position. For example, in *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146 (2d Cir. 1995), the court recognized "[u]nder New York law, the assignment of the right to assert contract claims does not automatically entail the right to assert tort claims arising from that contract[,]" *id.* at 151 (alterations added) (citing *Fox v. Hirschfield*, 157 A. D. 364 (1913)), but nevertheless held the scope of the assignment at issue was broad enough to include tort claims based on fraud because it transferred "all rights,

title and interest in [the loan,]" *id.* at 152 (alteration added). Not only has Plaintiff failed to provide any binding authority suggesting Florida courts default to a finding of non-assignment of tort claims, Plaintiff has also failed to demonstrate the Prestige Assignment language is qualified or limited in anyway.

Plaintiff's assertion clause (c) acts as a limitation on the scope of the assignment is unconvincing. Florida courts "interpret contracts in accordance with their plain and ordinary meaning when the contractual language is clear and unambiguous." *Harkless v. Laubhan*, 219 So. 3d 900, 904 (Fla. 2d DCA 2016) (citing *Bioscience W., Inc. v. Gulfstream Prop. & Cas. Ins. Co.*, 185 So. 3d 638, 640 (Fla. 2d DCA 2016)). And where the contract's language is "clear, unambiguous, and susceptible of only one interpretation," its construction is a question of law subject to the court's determination. *Gray v. D & J Indus., Inc.*, 875 So. 2d 683, 683 (Fla. 3d DCA 2004) (citation omitted).

The language "Assignor has not executed any release . . . relating to any lien . . . other than as provided in that certain Settlement Agreement" (Prestige Assignment ¶ 2(c) (alterations added)), has absolutely no bearing on what is assigned in the Prestige Assignment. As written, the clause refers to a "release" and not retention of a right, and it addresses a reservation of rights appearing in a settlement agreement between the Osman Family Network and Landmark. Prestige Worldwide is not a party to the settlement agreement. Moreover, the phrase is written in the past tense, and serves only to inform the reader of the rights Landmark has retained and which it is assigning. That is, as of the time of the Prestige Assignment, Assignor had not already released any claims other than those released in the Settlement Agreement and, therefore, they were subject to transfer to Prestige.

Because the Court concludes the Prestige Assignment is broad enough to include the claims Plaintiff raises in this action, and Plaintiff is unable to point to language in the Assignment limiting its scope, Plaintiff's claims arising from the Buckeye II Note and Collateral do not survive. Plaintiff may proceed on its remaining claims only insofar as they relate to the Stock Proceeds and CCFI Stock.

### B. Personal Jurisdiction

To determine whether it has personal jurisdiction over a non-resident defendant, a federal court sitting in diversity in Florida must inquire: "(1) whether personal jurisdiction exists over the non-resident defendant . . . under Florida's long-arm statute, and (2) if so, whether that exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment." *Louis Vuitton Malletier*, 736 F.3d at 1350 (alteration added) (citing *Mut. Serv. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312, 1319 (11th Cir. 2004)).

Plaintiff alleges CCFI is subject to specific personal jurisdiction under Florida Statute Sections 48.193(1)(a)(1) and (2), as well as general personal jurisdiction. (*See* Resp. 15). Under Florida's long-arm statute, a court has specific personal jurisdiction if a nonresident defendant

> who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself . . . to the jurisdiction of the courts of this state for any cause of action arising from any of the following acts: (1) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state. (2) Committing a tortious act within this state.

FLA. STAT. §§ 48.193(1)(a)(1)–(2) (alteration added). Under Florida law, "[i]f an individual successfully alleges that any member of a conspiracy committed tortious acts in Florida in furtherance of the conspiracy, then all of the conspirators are subject to personal jurisdiction in Florida." *Elandia Int'l, Inc. v. Ah Koy*, 690 F. Supp. 2d 1317, 1330 (S.D. Fla. 2010) (alteration

added) (citing *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1169 (11th Cir. 2005)).

As best the Court can surmise, Plaintiff is arguing CCFI conducts a business through its agent-subsidiaries in the state of Florida — a proposition Plaintiff also appears to argue supports general personal jurisdiction (*see* Resp. 17–21) — and the "tortious acts committed" are those for tortious interference and conspiracy to commit same.[2]   CCFI raises several arguments against a finding of personal jurisdiction, asserting it lacks the requisite contacts with the state and Plaintiff's agent-subsidiary theory fails.

CCFI points out it is an Ohio corporation that does not operate or conduct business in Florida, it has no offices in Florida, does not own or lease property in Florida, does not have employees in Florida, and does not maintain licenses in Florida.  (*See* Mot. 23).  CCFI explains it therefore "does not engage in substantial activity within Florida, let alone have such continuous and systematic contacts with Florida to render it 'essentially at home.'"  (*Id.* (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014))).  CCFI asserts it is similarly not subject to general personal jurisdiction by virtue of its relationship with Buckeye, given Buckeye, too, is an Ohio corporation.  (*See id.* 24).

CCFI also maintains the Court cannot exercise specific personal jurisdiction over it, as only Buckeye, and not CCFI, was a party to the transactions or agreements at issue.  (*See id.*).  And it states Plaintiff's allegations related to an agency theory of jurisdiction must fail.  (*See id.*).  According to CCFI, the fact it has subsidiaries subject to personal jurisdiction in Florida "does not make CCFI also subject to jurisdiction here."  (*Id.* (citing *Meier ex rel. Meier v. Sun Int'l*

---

[2]  A fraudulent transfer does not constitute a "tortious act" for purposes of satisfying Florida's long-arm statute.  *See Edwards v. Airline Support Grp., Inc.*, 138 So. 3d 1209, 1211–12 (Fla. 4th DCA 2014) (agreeing with the Florida Third and Fifth District Courts of Appeal in determining a fraudulent transfer is not a tortious act under Section 48.193, Florida Statutes).

*Hotels, Ltd.*, 288 F.3d 1264, 1272 (11th Cir. 2002))). And the analysis should not be altered by the fact "CCFI and Buckeye share common officers and a common headquarters . . . [because] '[t]he sharing of a business address and the overlap of offices is insufficient to support a finding that the subsidiaries are the alter ego of their corporate parents.'" (*Id.* (alterations added) (quoting *MeterLogic, Inc. v. Copier Sols.*, 126 F. Supp. 2d 1346, 1358 (S.D. Fla. 2000))).

CCFI asserts the fact all employees are in fact employees of CheckSmart Financial LLC, and not CCFI, bolsters its argument, as these employees merely provide services to both CCFI and Buckeye, and a "sharing arrangement" does not demonstrate the requisite operational control. (*Id.* 24–25). This, according to CCFI, "is a classic . . . example of officers holding the same position in two companies and changing hats to represent the two corporations separately." (*Id.* 25 (alteration added; internal quotation marks and alterations omitted) (quoting *Yellow Pages Photos v. Ziplocal, LP*, No. 8:12-cv-755-26TBM, 2012 WL 5830590, at *4 (M.D. Fla. Nov. 16, 2012))).

CCFI also contends Plaintiff's conclusory assertions regarding Buckeye conducting business exclusively for CCFI's benefit does not show operational control, as those operations are conducted by Buckeye officers, who are not CCFI employees. (*See id.*). All of the centralized functions to which Plaintiff refers in the Amended Complaint are in fact operated by non-CCFI employees and, "in any event[,] do not demonstrate a dominance of CCFI over the day-to-day business operations of Buckeye or any other affiliate." (*Id.* (alteration added; footnote call number omitted)). Neither do CCFI's SEC filings defining "company" as inclusive of CCFI and all of its subsidiaries. (*See id.* 25 n.9 (citing *UnitedHealthcare of Fla. v. Am. Renal Assocs. Holdings, Inc.*, No. 16-81180-CIV, 2017 WL 1832436, at *5, 7–8 (S.D. Fla. May 8, 2017))).

With respect to specific personal jurisdiction, CCFI is correct most of Plaintiff's allegations "have little to do with the claims pled in this case, [and] so should not be germane to a specific jurisdiction analysis." (Reply 14 (alteration added)). However, those that are tied to the claims are largely uncontested and do support the exercise of specific personal jurisdiction over CCFI. As Plaintiff notes, the limited evidence CCFI presents does not contradict a number of Plaintiff's jurisdictional allegations. (*See* Resp. 16–17).

Most persuasive are the undisputed allegations CCFI negotiated the MIPA, and CCFI directly benefits from a Right of First Refusal under the MIPA. (*See* Resp. 19–20). Defendant relies on the fact CCFI is not a party to the MIPA but offers no authority to suggest a defendant must be a party to an agreement to be subject to jurisdiction for tort claims. Taking these allegations as true, Plaintiff has shown CCFI conspired to commit, and in fact directly participated in, the tortious activity complained of when it negotiated the Buckeye II Sale.

In Florida, "if [plaintiff] has successfully alleged a cause of action for conspiracy among [defendants and a Florida resident] to commit tortious acts toward [plaintiff] and if she has successfully alleged that any member of that conspiracy committed tortious acts in Florida in furtherance of that conspiracy, then all of the conspirators are subject to the jurisdiction of . . . Florida." *Wilcox v. Stout*, 637 So. 2d 335, 337 (Fla. 2d DCA 1994) (alterations added). Because Defendants have "fail[ed] to dispute the underlying factual allegations that the Defendants engaged in a conspiracy," *Elandia Int'l*, 690 F. Supp. 2d at 1330 (alteration added); (*see also infra* Section III.C.3, C.5–6), and the Court "ha[s] jurisdiction over the alleged principal act," *Elandia Int'l*, 690 F. Supp. 2d at 1330 (alteration added); (*see also* Resp. 17 n.19 (noting Defendant concedes the Court has jurisdiction over CCFI's subsidiaries)), Florida jurisdiction attaches. Plaintiff's allegations satisfy Florida's long-arm statute. *See* Fla. Stat. §

48.193(1)(a)(2). Because the Court concludes specific personal jurisdiction exists, there is no need to engage in the general personal jurisdiction analysis.

Having determined CCFI is subject to personal jurisdiction under Florida's long-arm statute, the Court must now ensure such a finding comports with the Due Process Clause of the United States Constitution. *See Licciardello v. Lovelady*, 544 F.3d 1280, 1284 (11th Cir. 2008). "The Constitution prohibits the exercise of personal jurisdiction over a nonresident defendant unless his contact with the state is such that he has 'fair warning' that he may be subject to suit there." *Id.* (citation omitted). "This fair warning requirement is satisfied if the defendant has 'purposefully directed' his activities at the forum, . . . and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Madara v. Hall*, 916 F.2d 1510, 1516 (11th Cir. 1990) (alteration added) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984); then quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

A defendant's conduct and ties to the forum must also "be of a character that he should reasonably anticipate being haled into court there." *Id.* (citations omitted). "Jurisdiction is proper where the defendant's contacts with the forum proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum state." *Id.* (emphasis in original) (citation omitted).

This analysis requires the Court to determine whether the contacts are such that the exercise of personal jurisdiction would "comport with 'fair play and substantial justice.'" *Id.* (citation omitted).[3] To that end, courts consider the following factors: "the burden on the defendant in defending the lawsuit, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's

---

[3] Neither party has presented the Court with a minimum contacts analysis.

interest in obtaining the most efficient resolution of controversies and the shared interest of the states in furthering fundamental substantive social policies." *Id.* (citations omitted).

"[T]he Due Process clause is not violated when a court exercises jurisdiction over a defendant's intentional tortious conduct, committed outside of the forum state but calculated to cause injury in the forum state, because the defendant must have reasonably anticipated being haled into court in the forum state regarding those actions." *Elandia Int'l*, 690 F. Supp. 2d at 1338 (citing *Brennan v. Roman Catholic Diocese of Syracuse, N.Y., Inc.*, 322 F. App'x 852, 857 (11th Cir. 2009)); *see also Licciardello*, 544 F.3d at 1286 ("These allegations satisfy the *Calder* effects test for personal jurisdiction — the commission of an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum. The Constitution is not offended by the exercise of Florida's long-arm statute to effect personal jurisdiction over [defendant] because his intentional conduct in his state of residence was calculated to cause injury to [plaintiff] in Florida." (alterations added) (citing *Calder v. Jones*, 465 U.S. 783, 791 (1984))).

Plaintiff has alleged CCFI conspired to tortiously interfere with Plaintiff's contractual and business relationships, and that interference caused Plaintiff injury in Florida. *See, e.g.*, *Elandia Int'l*, 690 F. Supp. 2d at 1338 (holding due process requirements satisfied where plaintiff alleged co-conspirators committed intentional torts, including breach of fiduciary duty, conspiracy to commit same, and tortious interference); *see also Allerton v. State Dep't of Ins.*, 635 So. 2d 36, 39 (Fla. 1st DCA 1994) (where defendant was alleged to have committed intentional torts, including conspiracy to defraud, court concluded exercise of personal jurisdiction would comport with requirements of due process). These allegations are sufficient to satisfy due process.

The Court also concludes the additional factors weigh in favor of exercising personal jurisdiction over CCFI. First, Plaintiff alleges — and CCFI has not disputed — its officers travel to Florida frequently for work. (*See* Resp. 19). Even assuming some travel to Florida to defend against this action would pose a burden, "[m]odern means of communication and transportation have lessened the burden of defending a lawsuit in a distant forum." *Republic of Panama v. BCCI Holdings (Luxembourg), S.A.*, 119 F.3d 935, 947–48 (11th Cir. 1997) (alteration in original; internal quotation marks and citations omitted). The second factor also counsels in favor of exercising jurisdiction. "Florida has a great interest in protecting people dealing with corporations doing business in Florida," and the claims at issue "implicate[] Florida's interest in applying its law to adjudicate" a dispute involving a loan obligation governed by Florida law. *Renaissance Cruises, Inc. v. Glassman*, 738 So. 2d 436, 438 (Fla. 4th DCA 1999) (alteration added) (discussing application of Florida law to entire class in context of motion to certify); (*see also* Request for Judicial Notice; Ex. C, Assignment of Right to Proceeds [ECF No. 44-3] ¶ 2.1 (MGNF Assignment governed by Florida law); *see also id.*, Ex. D, Assignment of Right to Proceeds [44-4] ¶ 2.1 (MCN Assignment also governed by Florida law)).

Both the third and fourth factors, related to Plaintiff's and the interstate judicial system's interest in obtaining an efficient resolution, respectively, favor a finding of jurisdiction. While Plaintiff is not a Florida resident, both Plaintiff and the system would be served by litigating this action in Florida. Not only is a court sitting in Florida in the best position to apply the law of the state, but a number of key witnesses are located in Florida. (*See, e.g.*, Socolow Aff. ¶ 2–3; Mercer Decl. ¶ 2–3).

The above factors do not counsel against the exercise of jurisdiction, and CCFI has not argued doing so would offend traditional notions of fair play and substantial justice. Accordingly, the Court concludes it is appropriate to proceed with CCFI as a party to this action.

## C. Failure to State Claims for Relief

Because, as discussed, Plaintiff does not have standing to assert claims related to the Buckeye II Note and Collateral, the Court performs its analysis of the Rule 12(b)(6) arguments with respect to the CCFI Stock and Put Option exclusively.

### 1. Count I – Actual Fraud

"A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation: (a) [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." FLA. STAT. § 726.105(1)(a) (alterations added). Under the FUFTA's "actual fraud provision," to state a claim, a plaintiff must show: "[1] a creditor to be defrauded, [2] a debtor intending fraud, [3] and a conveyance of property which is applicable by law to the payment of the debt due." *Wiand v. Lee*, 753 F.3d 1194, 1199–1200 (11th Cir. 2014) (internal quotations marks omitted; alterations in original) (quoting *Johnson v. Dowell*, 592 So. 2d 1194, 1196 (Fla. 2d DCA 1992)).

Under the FUFTA, a "transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." FLA. STAT. § 726.102(14). Furthermore, an "asset" is "property of the debtor," but does not include "[p]roperty to the extent it is encumbered by a valid lien." *Id.* § 726.102(2)(a) (alteration added).

In Count I, Plaintiff alleges Buckeye II was required to fund the Put Option. (*See* Am. Compl. ¶ 143). In connection with the Buckeye II Sale, Defendants induced Pledgors and CCUSA Holdings to sell, assign, and transfer to Buckeye or CCFI their rights to the CCFI Stock and, consequently, the Stock proceeds. (*See id.* ¶ 148). Buckeye received nominal title to the CCFI Stock. (*See id.* ¶ 153). Defendants were aware of Landmark's security interests in the CCFI Stock and Stock Proceeds. (*See id.* ¶ 149). Landmark did not know of, or consent to, the numerous alleged transfers. (*See id.* ¶ 150).

As a result of the transfers, Landmark's security interests were impaired, and Landmark was forced to settle with the Osman Family Network for less than the full value of its interests. (*See id.* ¶¶ 155–56). These transfers were conducted with "actual intent to hinder, delay[,] and defraud Landmark." (*Id.* ¶ 157 (alteration added)).

Defendants contend the Amended Complaint fails to state a claim for actual fraud because Plaintiff's interest in the CCFI Stock was contingent and conditional, and because its interest in any CCFI Stock sale proceeds was uncertain as it could not force or prohibit any transfer of the CCFI Stock (*see* Mot. 13); the transfer of the CCFI Stock did not involve a transfer made or obligation incurred, but was instead the cancellation of an existing obligation for Buckeye II (*see id.*); and Plaintiff has not identified any false or fraudulent statements by the alleged debtor, Buckeye II, and cannot allege CCFI or Buckeye had any fiduciary duty to disclose any transactions with the debtor. (*See id.* 14).

With respect to the CCFI Stock, the fact the interest was "conditional or contingent," or Plaintiff could not force a sale, is immaterial. "[A]s is universally accepted, as well as settled in Florida, [a] claim under the Act may be maintained even though contingent and not yet reduced to judgment." *Friedman v. Heart Inst. of Port St. Lucie, Inc.*, 863 So. 2d 189, 192 (Fla. 2003)

(alterations added; internal quotation marks and citations omitted). Significantly, "[i]n this state contingent creditors and tort claimants are as fully protected against fraudulent transfers as holders of absolute claims." *Id.* (alteration added) (quoting *Money v. Powell*, 139 So. 2d 702, 703 (Fla. 2d DCA 1962); *see also* FLA. STAT. § 726.102(4) ("'Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, mature, unmatured, disputed, legal, equitable, secured, or unsecured.").

Plaintiff asserts the argument regarding cancellation of the obligation "misses the point of FUFTA" because "Defendants are transferees of debtors . . . who made a fraudulent conveyance of assets at Defendants' directive that could have been used to pay amounts owed to Landmark." (Resp. 6). The Court agrees with Plaintiff. Regardless of its ultimate effect on Buckeye II alone, the Amended Complaint's allegations show there was an asset disposed of which was otherwise applicable to make payments due to Plaintiff.

Lastly, the argument regarding Plaintiff's allegations of fraud is similarly unavailing. Although the Amended Complaint references Defendants' "duty to disclose the fraudulent transfers" (*id.* ¶ 151), Plaintiff is not attempting to state a claim for fraudulent misrepresentation. As noted, to survive a Rule 12(b)(6) motion on an actual fraud claim under the FUFTA, Plaintiff need only show the existence of (1) a creditor; (2) a debtor with fraudulent intent; and (3) conveyance of property which would otherwise apply to pay creditor. Given Plaintiff has satisfied the first and third elements, and intent need not be pled specifically in a fraudulent conveyance action, *see Perlman v. Five Corners Investors I, LLC*, No. 09-81225-CIV, 2010 WL 962953, at *4 (S.D. Fla. Mar. 15, 2010), Plaintiff has stated a claim for actual fraud under the FUFTA.

### 2. Count II – Constructive Fraud

In addition to its "actual fraud" provision, the "FUFTA also allows a creditor to avoid a debtor's transfer that is constructively fraudulent." *Wells Fargo Bank, N.A. v. Barber*, 85 F. Supp. 3d 1308, 1317 (M.D. Fla. 2015); *see also* FLA. STAT. § 726.105(1)(b). To state a claim under the FUFTA constructive fraud provision, a creditor must show:

> the debtor did not receive reasonable value for the transfer and either (1) the debtor was engaged or was about to engage in a business or transaction for which the debtor's remaining assets were unreasonably small in relation, (2) the debtor intended to, believed, or reasonably should have believed that she would incur debt beyond what she could pay as the debt became due, or (3) the debtor was insolvent at the time of the transfer.

*Wells Fargo Bank*, 85 F. Supp. 3d at 1317 (citing *Wiand v. Morgan*, 919 F. Supp. 2d 1342, 1355 & n.14 (M.D. Fla. 2013); additional citations omitted).

Disregarding the allegations related to the Buckeye II Note and Collateral, Count II alleges Defendants "deprived Landmark of its position with respect to the approximately six million dollars of collateral provided by Landmark's security interests in the CCFI Stock and CCFI Stock Proceeds." (Am. Compl. ¶ 164). Plaintiff also alleges "[t]he series of fraudulent transfers perpetrated by Defendants, with the cooperation and participation of the Osman Family Network, constitutes constructive fraud . . . because Buckeye II did not receive a reasonably equivalent value for the transfers," and because "Buckeye II was engaged in a transaction for which its remaining assets were unreasonably small in relation to the transaction." (*Id.* ¶ 160 (alterations added)).

As Defendant points out, these allegations are insufficient to state a claim for relief as they merely parrot the elements of the statute, without offering any supporting facts. *Cf. Mukamal v. Am. Express Co. (In re Arrow Air, Inc.)*, Adv. No. 12-1710, 2012 WL 6561313, at

*5 (Bankr. S.D. Fla. Dec. 14, 2012) ("To sufficiently allege [debtor] did not receive reasonably equivalent value for making the transfers, the [plaintiff] must state facts to plausibly 'show that the debtor received less than was given. . . . Here, the Complaint fails to state to what extent charges constitute 'excessive charges' and explain why the alleged charges did not provide reasonably equivalent value.'" (alterations added; citation omitted)). Count II fails to demonstrate why the alleged transfers were not given in exchange for reasonably equivalent value, or how the remaining assets were unreasonably small in relation to the transactions involving the CCFI Stock and Stock Proceeds. The allegations Plaintiff points to in its Response (*see* Resp. 7 (citing Am. Compl. ¶¶ 98–100, 107, 110, 112, 160–61)) are either related to the Buckeye II Collateral, or do not address the proportion of the transfer to the remaining assets or consideration. Accordingly, Plaintiff has not stated a claim for constructive fraudulent conveyance.

### 3. Count III – Civil Remedies for Criminal Practices Act Claim

Under Section 772.103, Florida Statutes,

> It is unlawful for any person: . . . [w]ho has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of criminal activity or through the collection of an unlawful debt to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment of any enterprise . . . . [or] [t]o conspire or endeavor to [do so].

*Id.* (alterations added). The definition of "criminal activity" includes violations of Section 817.562, Florida Statutes, which makes it a criminal act for a person

> having executed a security agreement creating a security interest in personal property, . . . which security interest secures a monetary obligation . . . and: (a) [h]aving under the security agreement both the right of sale or other disposition of the property and the duty to account to the secured party for the proceeds of disposition, he or

> she sells or otherwise disposes of the property and wrongfully and willfully fails to account to the secured party for the proceeds of disposition[.]

*Id.* (alterations added). Florida Statute Section 772.102(4) defines "pattern of criminal activity" as "engaging in at least two incidents of criminal activity that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents[.]" *Id.* (alteration added). Notably, the definition excludes "two or more incidents of fraudulent conduct arising out of a single contract or transaction against one or more related persons." *Id.*

The Amended Complaint alleges the CCFI Stock and Put Option are all security interests as defined by Florida Statute Section 817.562. (*See* Am. Compl. ¶ 167). Defendants' disposition of those interests in violation of the security agreements constitutes a felony under Section 817.562. (*See id.* ¶ 177). And Defendants' transactions disposing of those interests constitutes a "pattern of criminal activity" within the meaning of Section 772.104, Florida Statutes. (*See id.* ¶ 176).

Defendants argue Plaintiff has failed to properly allege they violated Section 817.562, Florida Statutes, and therefore Plaintiff cannot state a claim under Florida Statute Section 772.103. Regardless of whether the Amended Complaint alleges a violation of Section 817.562, however, it fails to demonstrate the "pattern of criminal activity" required to state a claim under Section 772.103.

Florida's Civil Remedies for Criminal Practices Act — alternatively known as Florida's RICO statute — "applies only where there has been some sort of ongoing criminal behavior." *Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 501 (Fla. 3d DCA 1994). The statute's purpose "is to punish, through civil penalties, actions which are ongoing and criminal in nature."

*Id.* The Florida Supreme Court has construed the "pattern" element as requiring, "in addition to similarity and interrelatedness of racketeering activities, proof that a continuity of particular criminal activity exists." *State v. Lucas*, 600 So. 2d 1093, 1094 (Fla. 1992) (quoting *Bowden v. State*, 402 So. 2d 1173, 1174 (Fla. 1981)). Among other things, this means "crimes committed at the same time cannot qualify as separate incidents for purposes of proving racketeering conduct." *Id.* at 1095–96 (citing *State v. Russo*, 493 So. 2d 504 (Fla. 4th DCA 1986)).

Additionally, where the crimes are no longer ongoing, the concept of "closed-ended continuity" requires proving "a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.* at 1094–95 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241–43 (1989)); *see also Profilet v. Cambridge Fin. Corp.*, 231 B.R. 373, 381 (S.D. Fla. 1999) ("[T]he continuity requirement can be satisfied either by showing past conduct that by its nature shows a threat of future racketeering or by showing repeated racketeering acts over a substantial period of time." (alteration added)).

According to the Amended Complaint, both the CCFI Stock transfer and Put Option cancellation were offered in consideration for the same transaction: the Buckeye II sale. (*See* Am. Compl. ¶ 100). Even taking into account the transfer of the Buckeye II Note and Collateral, the Amended Complaint does not show the continuity required to establish a pattern under the above-described principles, nor has Plaintiff alleged any threat of future criminal conduct. Because Plaintiff has failed to show the "pattern" required under Florida's Civil Remedies for Criminal Practices Act, Count III must be dismissed. *See, e.g.*, *Profilet*, 231 B.R. at 381–82 (dismissing Florida RICO count where plaintiff alleged only one scheme: defrauding and bankrupting debtor, which was a closed-ended scheme with no threat of future criminal conduct).

### 4. Count IV – Conspiracy to Commit Fraudulent Transfer

To state a claim for civil conspiracy, a plaintiff must allege the existence of: (1) a conspiracy between two or more parties; (2) to do an unlawful act or a lawful act using unlawful means; (3) the commission of an overt act in furtherance of the conspiracy; and (4) damage to plaintiff resulting from the conspiracy. *See Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006).

Plaintiff alleges Defendants, along with the Osman Family Network, conspired "to concoct a series of fraudulent transfers and transactions designed to achieve their purposes; to conceal those fraudulent transfers and transactions from Landmark; . . . and to claw back the CCFI Stock, all to Landmark's substantial detriment." (Am. Compl. ¶ 185 (alteration added)). In furtherance of the conspiracy, Defendants entered into the fraudulent transfers along with the Osman Family Network. (*See id.* ¶ 186). As a result, Defendants and the Osman Family Network canceled the Put Option, weakening Plaintiff's collateral position in connection with the MGNF and MCN Loans by about $6,000,000 dollars. (*See id.* ¶ 189).

Defendant argues this claim fails because the (1) FUFTA does not allow claims against non-transferees for facilitating fraudulent transfers and (2) Plaintiff has not stated a claim for fraudulent transfers and so cannot state a claim for conspiring to commit same. (*See* Mot. 16–17). By the Reply, Defendants' former argument has morphed into an assertion a fraudulent transfer claim is not a tort claim, which is necessary to state a claim for civil conspiracy. (*See* Reply 10). Additionally, Defendants argue the FUFTA does not provide for any conspiracy cause of action. (*See id.*).

Plaintiff responds by pointing out the Amended Complaint alleges Defendants were transferees of the fraudulent transfers and therefore can be liable for conspiracy. (*See* Resp. 10

(citing Am. Compl. ¶¶ 144–47, 182)). Plaintiff also states out "Florida law recognizes causes of action for conspiracy to defraud, including conspiracy to commit fraudulent transfer where the same is brought against a transferee." (*Id.* 10–11 (citations omitted)).

In support of their position, Defendants rely on the Florida Supreme Court's decision in *Freeman v. First Union Nat'l Bank*, 865 So. 2d 1272 (Fla. 2004) — but their reliance is misplaced. In *Freeman*, the court held the "FUFTA was not intended to serve as a vehicle by which a creditor may bring a suit against a non-transferee party . . . for monetary damages arising from the non-transferee party's alleged aiding-abetting of a fraudulent money transfer." *Id.* at 1277 (alteration added). That language is inapposite; however, as it exempts only non-transferees from liability, and Plaintiff has expressly alleged Defendants are transferees. (*See* Am. Compl. ¶¶ 148, 182); *see also 8699 Biscayne, LLC v. Indigo Real Estate, LLC (In re 8699 Biscayne, LLC)*, Adv. No. 08-01749, 2010 WL 1375558, at *3 (Bankr. S.D. Fla. Apr. 2, 2010) (denying motion to dismiss as to fraudulent transfer conspiracy count because defendants were alleged to be "active participants and transferees to the purported fraudulent case").

And the Court is unpersuaded by Defendants' assertion the FUFTA does not provide a conspiracy cause of action. As the court in *Canon Latin America, Inc. v. Lantech (C.R.), S.A.*, explained, "[t]he fact that the Florida legislature did not incorporate into FUFTA an independent cause of action against those who assist debtors in fraudulently evading their creditors should not be equated with the abrogation of all common law claims that would otherwise exist against the debtors' co-conspirators." No. 08-21518-CIV, 2009 WL 10664392, at *4 (S.D. Fla. Apr. 29, 2009).

### 5. Counts V and VI – Tortious Interference with a Contract and Conspiracy Claims

"Under Florida law, the tort of contractual interference occurs when the defendant (1) has knowledge of (2) an enforceable contract between the plaintiff and a third party and (3) intentionally and (4) unjustifiably interferes with the plaintiff's rights under that contract, (5) thereby causing the plaintiff injury." *Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*, 678 F. App'x 839, 847 (11th Cir. 2017) (citing *Mariscotti v. Merco Grp. at Akoya, Inc.*, 917 So. 2d 890, 892 (Fla. 3d DCA 2005)).

Plaintiff alleges valid and enforceable contracts existed — the security agreements tied to the MCN and MGNF Loans — and Defendants were aware of them as of at least July 30, 2014, following Plaintiff's letter to Buckeye informing it of OFH's default. (*See* Am. Compl. ¶¶ 195–96; *see also* July 30 Letter). Defendants subsequently "induced Pledgors to sell, assign, transfer and set over their interests in the CCFI Stock." (*Id.* ¶ 200). According to Plaintiff, "Defendants' actions also caused Pledgors to breach their obligations under the instruments securing the MCN and MGNF Loans and related forbearance agreements." (*Id.* ¶ 203). Defendants' actions were unjustified and were undertaken without privilege because Defendants are not Plaintiff's competitors and they used improper means to achieve their goals. (*See id.* ¶ 204). Landmark has suffered, and continues to suffer damages, as a result of Defendants' interference. (*See id.* ¶ 205). Specifically, these actions "deprived Landmark of its position with respect to the approximately six million dollars in collateral provided by Landmark's security interests in the CCFI Stock and CCFI Stock Proceeds." (*Id.* ¶ 207).

Plaintiff further alleges, although merely incorporated by reference (*see id.* ¶ 208), "[i]n furtherance of their conspiracy, Defendants . . . induced Pledgors to breach their obligations under the instruments securing the MCN and MGNF Loans and related forbearance agreements"

(*id.* ¶¶ 213–14 (alterations added)). Also relevant to this Count (*see* Resp. 11–12), Plaintiff alleges Defendants "buil[t] the disposition of the CCFI Stock and the Put Option into the Membership Purchase Agreement." (Am. Compl. ¶ 101 (alteration added)). Defendants then "threatened to allow all branch locations of Buckeye II's southeast Florida check cashing and payday lending business . . . to go dark and cease operations. In other words, CCFI and Buckeye threatened to render the business worthless." (*Id.* ¶ 91 (alteration added)). Therefore, such actions effectively induced Pledgors' complicity.

Defendants argue Count V fails to state a claim because (1) Plaintiff could not force or prohibit a sale of the CCFI Stock and therefore the Stock transfer did not "procure a breach"; (2) Plaintiff has not pled a "factual basis to demonstrate that either [Defendants] knew that [Plaintiff] had a contractual right to anything other than cash proceeds from the sale of the CCFI Stock"; (3) Landmark has not pled a lack of justification or privilege; (4) Plaintiff has not pled a basis to create a duty for Buckeye to disclose transactions to Plaintiff[4]; and (5) CCFI was not a party to either of the "vehicles [Plaintiff] pleads as causing the tortious interference in Count V." (Mot. 18–19 (alterations added; citations and emphasis omitted)).

In support of their contention Plaintiff had no right to force or prevent a sale, and therefore the transfer did not constitute a breach, Defendants cite *Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1321 (11th Cir. 1998), but offer absolutely no analysis. *Johnson Enterprises* does not appear to address the potential breach of a contract based on cancelation of a contingent or conditional interest. And the Court is not persuaded an action may not be maintained for tortious interference with a contract, even where the agreement is conditional. *Cf. Nautica Int'l, Inc. v. Intermarine USA, L.P.*, 5 F. Supp. 2d 1333, 1345–46

---

[4] This is irrelevant to Plaintiff's claim. (*See supra* 20).

(S.D. Fla. 1998) (denying motion to dismiss as to tortious interference claim where plaintiff's business opportunity was contingent upon defendant winning contract).

Defendants' argument Plaintiff has not offered factual allegations to show Plaintiff was entitled to more than the cash proceeds of a CCFI Stock sale also fails. Even assuming no such factual allegation appeared in the Amended Complaint, Defendants have not explained why Defendants' knowledge of Plaintiff's interest in the CCFI Stock Proceeds is insufficient to state a claim for tortious interference with a contract.

Defendants' reliance on Plaintiff's failure to plead a "lack of justification or privilege" is misplaced. "Florida law recognizes the principle that actions taken to safeguard or protect one's financial interest, so long as improper means are not employed, are privileged." *Johnson Enters.*, 162 F.3d at 1321 (citing *Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1225 (Fla. 3d DCA 1980); other citation omitted). Defendants appear to concede this point (*see* Reply 11), but maintain Plaintiff's claim should be dismissed for failure to plead any wrongful conduct on their part. Given the allegations Defendants procured these transfers using threats and with intent to defraud, this argument is meritless.

Defendants have offered no authority or analysis in support of their argument Count V should be dismissed as to CCFI because CCFI is not a party to either the MIPA or the Intercreditor Agreement. First, as Plaintiff points out, the MIPA confers certain rights upon CCFI. (*See* Resp. 12–13 n.14). In addition, Plaintiff has alleged CCFI is liable under both a conspiracy theory, as well as a theory of principal-agent liability. (*See id.* 12). To state a claim for tortious interference with a contract, Plaintiff need only allege Defendants "interfered," and the Amended Complaint contains sufficient allegations, taken as true, to show they did.

Defendants argue Count VI fails because Plaintiff cannot state a claim for tortious interference with a contract and therefore cannot state a claim for conspiracy to commit same. Given the Court's conclusion Count V survives the Motion, this argument fails.

### 6. Counts VII and VIII – Tortious Interference with a Business Relationship and Conspiracy Claims

To state a claim for tortious interference with a business relationship, a plaintiff must show: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985). Florida courts have determined tortious interference with a business relationship and tortious interference with a contract are nearly identical causes of action, with the "only material difference" being "in one there is a contract and in the other there is only a business relationship." *Smith v. Ocean State Bank*, 335 So. 2d 641, 642 (Fla. 1st DCA 1976).

In support of its tortious interference with a business relationship claim, Plaintiff alleges it had a business relationship with Buckeye II given Buckeye II's obligations to fund the Put Option. (*See* Am. Compl. ¶ 221). Defendants were aware of the business relationship at least as of July 30, 2014. (*See id.* ¶ 222). Defendants induced Pledgors to breach their obligations under the instruments securing the MCN and MGNF Loans with the CCFI Stock transfer. (*See id.* ¶ 228). Defendants had neither privilege nor legal justification to do so because they are not Plaintiffs' competitors and they used improper means to achieve their ends. (*See id.* ¶ 230). Landmark continues to suffer damages as a result, in connection with the transfer of the CCFI Stock. (*See id.* ¶ 233).

Defendants' numerous arguments primarily focus on Plaintiff's allegations related to the Buckeye II Note and Collateral and are therefore not relevant to the Court's analysis. In connection with the CCFI Stock and Put Option, Defendants argue Count VII fails because the transfer of a company from one owner to another does not interfere with the company's business relationships and Buckeye had an absolute right to transfer Buckeye II; Plaintiff could not have forced Buckeye II to buy back the CCFI Stock; and Defendants had an interest in the alleged business relationship and so cannot have tortiously interfered with it. (*See* Mot. 20–21).

Defendants' argument related to Plaintiff's right to force a sale of the CCFI Stock is addressed elsewhere in this Order (*see supra* 19, 28), and therefore is not addressed here. Defendants' remaining arguments are, essentially, arguments claiming an absolute privilege to engage and interfere with Buckeye II's business relationships.

The law in Florida is well-settled, "[f]or the interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship." *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 386 (Fla. 4th DCA 1999) (alteration added; citations omitted). "[T]he privilege to interfere is a valid defense . . . only where the interference was not done for some improper purpose." *Burger King Corp. v. Ashland Equities, Inc.*, 161 F. Supp. 2d 1331, 1336 (S.D. Fla. 2001) (alterations added; citing *Morsani v. Major League Baseball*, 663 So. 2d 653, 657 (Fla. 2d DCA 1995); then citing *Nizzo v. Amoco Oil Co.*, 333 So. 2d 491, 494 (Fla. 3d DCA 1976)). Defendants may not assert this privilege "when they have acted with malicious or conspiratorial motives." *Id.* (citing *Morsani*, 663 So. 2d at 657; then citing *Yoder v. Shell Oil, Co.*, 405 So. 2d 743, 744 (Fla. 2d DCA 1981)).

As noted, the Amended Complaint states claims for fraudulent conveyance and conspiracy to commit same. (*See supra* § III.C.1). Such intent would constitute "improper

purpose," thus abolishing whatever privilege Defendants might have otherwise invoked. Furthermore, "actions alleging tortious interference for an improper purpose . . . raise the question of whether the interfering party has gone beyond its limited and qualified privilege. . . . Such a determination . . . is generally reserved for the trier for fact." *Burger King*, 161 F. Supp. 2d at 1337–38 (alterations added) (citation omitted).

As in their argument related to Count VI, Defendants contend a claim for conspiracy cannot stand without an underlying tort. (*See* Mot. 22). Because Count VII survives the Motion, this argument fails.

## IV.    CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** as follows:

1.  Plaintiff's Request for Judicial Notice **[ECF No. 52]** is **DENIED**.

2.  Defendants' Motion to Dismiss **[ECF No. 43]** is **GRANTED in part** and **DENIED in part** as follows:

    a.  Defendant CCFI's Rule 12(b)(2) Motion to Dismiss is **DENIED**.

    b.  Counts II and III are **DISMISSED**.

    c.  Defendants shall file their answers to the Complaint on or before **October 12, 2017**.

    **DONE AND ORDERED** in Miami, Florida this 28th day of September, 2017.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record